**Madison D. LOCKE, Rosalie E. Locke, Sam Buccambuso, and Tony Buccambuso, Plaintiffs,**

v.

**UNITED STATES of America, United States Department of the Interior, James Watt, Secretary of the Interior, Bureau of Land Management, and Robert F. Burford, Director of the Bureau of Land Management, Defendants.**

**Civ. No. R–82–297 BRT.**

United States District Court, D. Nevada.

Oct. 20, 1983.

Bosen, Swafford & Hoffman, Harold A. Swafford, Reno, Nev., for plaintiffs.

Lamond R. Mills, U.S. Atty., Shirley Smith, Asst. U.S. Atty., Reno, Nev., for defendants.

### ORDER GRANTING SUMMARY JUDGMENT

BRUCE R. THOMPSON, District Judge.

The primary issue raised by the parties' cross-motions for summary judgment is the constitutionality of 43 U.S.C. § 1744(a) and (c). This statute creates an irrebuttable presumption that mining claims are abandoned if the miner fails to timely file an annual proof of labor (assessment notice). After careful consideration,

we conclude that this statute violates the due process clause of the Fifth Amendment. In addition, we conclude that the plaintiffs here have substantially complied with the statute regardless of its constitutionality.

Plaintiffs, Madison and Rosalie Locke, et al. (Lockes), are owners of ten unpatented mining claims from which they produce gravel and building materials. These claims are located in the state of Nevada on public land belonging to the United States Government. The Lockes have successfully earned their livelihood by mining these claims since 1960. During that period these claims have produced approximately $4,000,000 in materials, with over $1,000,000 of that being produced during the 1979–1980 assessment year.

In 1976, the United States enacted the Federal Land Policy and Management Act, Pub.L. No. 94–579, 90 Stat. 2743 (codified at 43 U.S.C. §§ 1701–82) (FLPMA) which required the Lockes to register their unpatented claims with the Bureau of Land Management (BLM) by October 21, 1979. They complied fully with this initial filing requirement on October 19, 1979. Each calendar year thereafter, FLPMA further requires a filing of the assessment notice (showing that $100 worth of labor has been performed on the claim during the assessment year) "prior to" December 31. 43 U.S.C. § 1744(a). It is this provision which creates the controversy here.

In an effort to comply fully with this provision, the Lockes sent their daughter, who was working in their business office, to the Ely office of the BLM. There she inquired as to the procedure for filing the assessment notice. She was told that the documents should be filed at the Reno BLM office "on or before December 31, 1980." Affidavit of Laura C. Locke, August 28, 1981, para. 3. (The identity of the federal employee who allegedly gave this advice is unknown. Therefore, we place no reliance on the advice. The uncontradicted evidence of the inquiry is, nevertheless, evidence of lack of intent to abandon). The Lockes then chose to hand-deliver the docu-

ments to assure their delivery and, on December 31, 1980, the assessment notices were filed at the Reno BLM office.

On April 4, 1981, the Lockes received notice that their mining claims were declared "abandoned and void" for failure to comply with 43 CFR § 3833.2–1 (the BLM's regulation promulgated under 43 U.S.C. § 1744 which requires filing the assessment notices "on or before December 30" of each calendar year. 43 CFR § 3833.2–1(a) (1982)). On May 1, 1981, they appealed the declaration of abandonment to the Interior Board of Land Appeals (IBLA). That body ruled on June 25, 1982 that the Lockes had missed the December 30, 1980 deadline and thus their claims were forfeited. The IBLA refused to address the Lockes' constitutional arguments. They then instituted this action to challenge the constitutionality of 43 U.S.C. § 1744 as depriving them of procedural due process under the Fifth Amendment.

 In order to establish a deprivation of their due process rights, the Lockes must first show that the laws creating these rights give rise to a "legitimate claim of entitlement." *Memphis Light, Gas and Water District v. Craft*, 436 U.S. 1, 12, 98 S.Ct. 1554, 1561, 56 L.Ed.2d 30 (1978). The Supreme Court has held that unpatented mining claims are a possessory mineral interest in land, as well as "property in the fullest sense of that term." *Wilbur v. United States ex rel. Krushnic*, 280 U.S. 306, 316, 50 S.Ct. 103, 104, 74 L.Ed. 445 (1930); *see also, Best v. Humboldt Mining Co.*, 371 U.S. 334, 335, 83 S.Ct. 379, 381, 9 L.Ed.2d 350 (1963). Similarly, the Ninth Circuit Court of Appeals recently concluded that the holder of an unpatented mining claim has a property right: "[b]ecause an unpatented mining claim is a unique form of property which created in the owners a possessory interest in the land, the loss of such an interest would constitute a substantial injury." *Western Mining Council v. Watt*, 643 F.2d 618, 628 (9th Cir.1981) (citations omitted). Thus, there can be little doubt that the Lockes' unpatented claims rise to the level of a property inter-

est sufficient to warrant due process protection.

The Lockes contend that the language of 43 U.S.C. § 1744, establishing conclusively that they have abandoned their claims, is tantamount to declaring a forfeiture of their claims. They note that, although the BLM has recommended that they relocate their claims, it is uncontroverted that they are precluded from doing so by 30 U.S.C. § 611, the so-called "Common Varieties Act." Thus, they are prevented from mining their old claims and at the same time from relocating the claims.

The government, however, contends that the term "abandonment" in the statute is not the same as "forfeiture," and thus an extinguishment of the Lockes' rights does not occur merely by operation of the presumption. This reasoning is not persuasive. The American Law of Mining distinguishes between abandonment and forfeiture in Section 8.2 of Volume 2 by stating:

> Although there is a clear distinction between abandonment and forfeiture, the terms are frequently used as though they were interchangeable. The resulting confusion is compounded by statutes which provide that certain acts, unaccompanied by the requisite intent, shall constitute an abandonment.... To show abandonment, the intent of the claimant must be determined; to show forfeiture, only noncompliance with the requirements of law must be shown.

2 Rocky Mountain Mineral Law Foundation, *The American Law of Mining* 195–96 (1981) (footnotes omitted).

■ The statute creates a forfeiture of plaintiffs' rights in the mining claims since they at no time evidenced an intent to abandon those claims. This forfeiture extinguishes their previously valid interests and results in a taking of their property sufficient to trigger the due process protections of the Fifth Amendment.

After establishing the existence and loss of their rights in the subject claims, we turn to what quality of procedural process is "due" the Lockes before their property

rights may be extinguished. Some guidance in this regard can be drawn from the law prior to the passage of FLPMA. In 1920, the Supreme Court ruled that the holder of an unpatented mining claim possesses a property right worthy of strong due process protections:

> [o]f course, the land department [BLM] has no power to strike down a claim arbitrarily, but so long as the legal title remains in the government it does have power, *after proper notice and upon adequate hearing*, to determine whether the claim is valid and, if it be found invalid, to declare it null and void.

*Cameron v. United States*, 252 U.S. 450, 460, 40 S.Ct. 410, 412, 64 L.Ed. 659 (1920) (emphasis added). Thus, pre-FLPMA miners were entitled at the least to notice and a hearing prior to forfeiture of their claims.

■ In determining which procedural safeguards must be afforded post-FLPMA miners, this Court would normally consider the extent to which they might suffer grievous loss, the nature of the governmental function involved, and the nature of the private interest affected. *Morrissey v. Brewer*, 408 U.S. 471, 481–82, 92 S.Ct. 2593, 2600–2601, 33 L.Ed.2d 484 (1972). But, where the statute in question creates an irrebuttable presumption, we must instead look to the nature of that presumption before balancing these factors. *Vlandis v. Kline*, 412 U.S. 441, 452, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63 (1973). The Supreme Court in *Vlandis v. Kline* established a two-prong test for the presumption analysis. *Id.* If " 'the presumption is not necessarily or universally true in fact' and the government has available 'reasonable alternative means of making the crucial determination,' " then due process demands a hearing to rebut the presumption. *Rogers v. United States*, 575 F.Supp. 4 (D.Mont.1982) (quoting *Vlandis v. Kline, supra,* 412 U.S. at 452, 93 S.Ct. at 2236); *see also, Stanley v. Illinois*, 405 U.S. 645, 658, 92 S.Ct. 1208, 1216, 31 L.Ed.2d 551 (1972) (due process hearing required to rebut conclusive presumption that unmarried

father was unfit as a parent since this presumption not universally true).

The present case perfectly illustrates a presumption that is not necessarily or universally true in fact. The Lockes mined over $1,000,000 worth of materials from their "abandoned" mines during the 1979–80 assessment year. They filed proofs of annual labor with the White Pine County Recorder on August 26, 1980. They filed the proper documents at the Reno office of the BLM on December 31, 1980, one day after the December 30, 1980 deadline. It would be absurd in light of these facts to conclude that the Lockes intended to abandon their claims. Thus, they have met the first prong of the *Vlandis* test.

The second prong of the *Vlandis* test concerns the government's ability to make a reasonable determination of whether the fact(s) presumed actually exist. At the outset we note the government's argument that the Supreme Court case of *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1974), would deny the Lockes a prior hearing to rebut the conclusive presumption of abandonment. Although at first blush the *Salfi* case may appear to contradict *Vlandis*, there is a clear basis for distinguishing the two.

In *Vlandis*, a student whose address was listed as out of state during the year preceding his enrollment in a Connecticut state university was conclusively presumed to be a nonresident. This presumption continued for as long as the student attended Connecticut schools, resulting in a higher tuition for that student throughout his academic career. *Vlandis v. Kline, supra,* 412 U.S. at 442–44, 93 S.Ct. at 2231–2232. A rather simple determination of the actual residency of each student would have been feasible. *Id.* at 451–52, 93 S.Ct. at 2236.

Conversely, in *Salfi*, the presumption was that a marriage was a "sham" for Social Security purposes if entered into within nine months prior to the death of one spouse. This presumption operated to deprive surviving spouses of Social Security payments they would have received had the marriage occurred ten months prior to

death. The court upheld the presumption and ruled that no prior hearing was required to rebut it. Writing for the court, Justice Rehnquist noted that, although the statute undoubtedly excluded some deserving claimants, "[it is not] at all clear that individual determinations could effectively filter out sham arrangements, since neither marital intent, life expectancy, nor knowledge of terminal illness has been shown by appellees to be reliably determinable." *Salfi, supra,* 422 U.S. at 782–83, 95 S.Ct. at 2475 (footnote omitted). Thus, a prior hearing could not have reasonably determined the fact presumed in *Salfi*.

The facts of the present case more closely resemble those of *Vlandis*, where individual determinations were clearly possible. Unlike the *Salfi* case, this objective requirement is easily determinable at a hearing. In addition, we agree with the Montana district court that such a hearing would not be overly burdensome to the BLM. *Rogers v. United States, supra,* No. 80–14, slip. op. at 10–11. "[I]t is not asking too much of the government to provide the holder of property in the form of an unpatented mining claim a hearing before the BLM upon whether he has abandoned his mining claim." *Id.*

■ We therefore conclude that the second prong of *Vlandis*, the existence of a reasonable alternative means of making the factual determination, is likewise met in this case. Since the Lockes satisfy both parts of the *Vlandis* test, it follows that they are entitled to a pre-forfeiture hearing. *Vlandis v. Kline, supra,* 412 U.S. at 452, 93 S.Ct. at 2236.

In agreeing with the *Rogers* case concerning procedural due process, however, we note that *Rogers* dealt with the initial filing requirement of 43 U.S.C. § 1744 instead of the subsequent annual filings at issue here. This important distinction, which strengthens the Lockes' right to a hearing, is highlighted by the legislative history of Section 1744 and the Act of which it is a part.

The mining provisions of FLPMA trace their original roots to a report prepared in 1970 by the Public Land Law Review Commission (PLLRC). The PLLRC report established the need for a uniform system of mining claim recordation. "The General Mining Law currently requires compliance with location and discovery requirements of state law. State laws on this subject vary widely and many are obsolete or archaic in light of modern technology." PLLRC, *One Third the Nation's Land* at 130 (1970). The purpose for establishing this new uniform system was to clear abandoned claims from public lands. "Congress should establish a fair notice procedure (a) to clear the public lands of long-dormant mining claims.... Clearing the record of an estimated 5.5 million long-dormant claims would assist in achieving more efficient land planning and management by Federal agencies." *Id.*

The recommendations of the PLLRC were later incorporated in Senate Bill 507 (94th Cong., 2nd Sess.), which finally was amended and passed as FLPMA. The Senate report from the Committee on Interior and Insular Affairs regarding S 507 further demonstrates that the purpose of 43 U.S.C. § 1744 was to clear long-dormant claims:

[T]he Committee did address a particular procedural problem concerning the registration of mining claims—a problem which is particularly frustrating to the public land manager. The source of this problem is what is often termed "stale claims". There is no provision in the 1872 Mining Law, as amended, requiring notice to the Federal government by a mining claimant of the location of his claim. The mining law only requires compliance with local recording requirements, which usually means simply an entry in the general county land records. Consequently, Federal land managers do not have an easy way of discovering which Federal lands are subject to either valid or invalid mining claim locations. According to some estimates, there are presently more than 6,000,000 unpatented claims on the public lands, excluding

national forests, and more than half of the units of the National Forest System are reputedly covered by mining claims. Of course, the vast majority of these claims will never be pursued, and do not directly interfere with land management. They do, however, create significant uncertainty regarding the actual extent of valid locations.

S.Rep. No. 94–583, 94th Cong., 2nd Sess. 65 (1975) (footnote omitted).

In order to clear these abandoned claims, Congress used the conclusive presumption of 43 U.S.C. § 1744, since giving notice to individual miners would have involved the awesome task of searching every local title record.

In this case, the initial filing has occurred. There is no longer a burden on the government to ascertain the identity of the miner since they already have a file with his name on it. An inquiry as to whether the miner intends to abandon his claim could easily occur by letter. In fact, the BLM presently notifies by mail each miner failing to file the annual assessment notice that their claim has been declared "abandoned and void." Why then would it be more difficult to notify them that they have failed to comply with 43 U.S.C. § 1744 *prior* to forfeiture? And, if abandonment is in dispute, how difficult would it be for the BLM to offer miners a pre-forfeiture hearing on whether they have performed the minimum assessment work necessary to keep their claim(s) active? Without these procedural safeguards, 43 U.S.C. § 1744 no longer serves its intended purpose of clearing public lands of abandoned claims. Instead, it becomes a convenient device for the government to reclaim established mines for profit at the expense of unprotected and unwary miners. This is true even though those miners have attempted in good faith to comply with every letter of the statute.

In addition, even if the requirement of a pre-forfeiture notice and hearing did increase the steps necessary for the BLM to reclaim public lands, the Supreme Court

has held that " 'the Constitution recognizes higher values than speed and efficiency.' The [government's] interest in administrative ease and certainty cannot, in and of itself, save the conclusive presumption from invalidity under the Due Process Clause where there are other reasonable and practicable means of establishing the pertinent facts on which the [government's] objective is premised." *Vlandis v. Kline, supra,* 412 U.S. at 451, 93 S.Ct. at 2236 (quoting from *Stanley v. Illinois, supra,* 405 U.S. at 656, 92 S.Ct. at 1215) (citation omitted). It seems clear that in this case there are other reasonable and practicable methods for establishing whether a miner intends to abandon his claim by not timely filing his assessment notice. It also seems clear that the Lockes have not intended to abandon their claims by filing one day late.

We therefore grant the Lockes' motion for summary judgment and hold that 43 U.S.C. § 1744 is an unconstitutional violation of procedural due process insofar as it creates an irrebuttable presumption of abandonment for failure to timely file the annual assessment notice.

Even if we concluded that the Lockes had not been deprived of their due process rights, we would still grant their motion for summary judgment based on the legislative history of 43 U.S.C. § 1744 as outlined above. Although that statute seems to create a conclusive presumption of abandonment where the assessment notice is not timely filed,[1] this construction does not comport with a reasonable reading of the statute's legislative history or the law prior to FLPMA. As Judge Learned Hand stated: "it is a commonplace that a literal interpretation of the words of a statute is not always a safe guide to its meaning." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960). The Supreme Court has also held that "[i]t is a familiar rule, that a thing may be within the letter of the statute and yet not within

the statute, because not within its spirit, nor within the intention of its makers." *Holy Trinity Church v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

It seems abundantly clear from the history of Section 1744 that it was designed to clear the land of "stale" and "long-dormant" claims. In order to do this, miners were given three years to file their location notices with the BLM. Once this occurred, and those failing to file lost their claims, the purpose of the statute was met. There is no evidence in FLPMA's voluminous history that Congress intended to utilize the annual filings to clear these long-dormant claims. Instead, the evidence indicates that the annual filings were designed to maintain a current index of non-patented claims merely for the convenience of federal land managers. S.Rep. No. 94–583, 94th Cong., 2nd Sess. 65 (1975). In essence, 43 U.S.C. § 1744 simply added a federal recording requirement to the existing General Mining Law provision mandating local recordation of assessment notices. In fact, to satisfy the assessment notice regulations, miners file the exact same documents with both the county recorder's office and the BLM. 43 C.F.R. § 3833.2–1 (1982).

The General Mining Law assessment provision, codified at 30 U.S.C. § 28, has been the subject of several Supreme Court cases. The more significant of these have held that "substantial compliance" with the assessment notice requirement was sufficient to satisfy the statute, since "the 'possessory title' of the claimant, granted by 30 U.S.C. § 26, [may] not be disturbed on flimsy or insubstantial grounds." *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 57, 91 S.Ct. 196, 201, 27 L.Ed.2d 193 (1970); *see also, Wilbur v. Krushnic,* 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930), and *Ickes v. Virginia-Colorado Development Corp.,* 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935).

---

**1.** "The failure to file such instruments as required by subsections (a) and (b) of this section shall be deemed conclusively to constitute an abandonment of the mining claim...." 43 U.S.C. § 1744(c).

After *Hickel v. Oil Shale Corp.*, the language of the BLM's assessment work regulation was amended to read that substantial compliance was all that was required.[2]

It seems to us anomalous that the government should insist upon the strict forfeiture declared by 43 U.S.C. § 1744 and at the same time retain the regulations under 30 U.S.C. § 28 recognizing substantial compliance as the standard.

■■■ The history of FLPMA, the stated purpose of 43 U.S.C. § 1744, and the Supreme Court precedent of *Hickel*, all indicate that the standard to be applied to assessment notice requirements is substantial compliance. Measured against this, the Lockes have satisfied their statutory duties under Section 1744 by filing their notices one day late.

In consideration of the premises,

IT HEREBY IS ORDERED that plaintiffs' motion for summary judgment is hereby granted and defendants' motion for summary judgment is hereby denied.

---

**2.** Before 1972, the regulation provided:

§ 3841.3 Failure to perform assessment work.

Failure to make the expenditure or perform the labor required upon a location made before or since May 10, 1872 will subject a claim to relocation unless the original locator, his heirs, assigns, or legal representatives have resumed work after such failure and before relocation.

After 1972, the regulation provided, and still provides:

§ 3851.3 Effect of failure to perform assessment work.

(a) Failure of a mining claimant to comply substantially with the requirement of an annual expenditure of $100 in labor or improvements on a claim imposed by section 2324 of the Revised Statutes (30 U.S.C. 28) will render the claim subject to cancellation.

(b) Failure to make the expenditure or perform the labor required upon a location will subject a claim to relocation unless the original locator, his heirs, assigns, or legal representatives have resumed work after such failure and before relocation.